IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

|  |  |  |
|---|---|---|
| WILLIAM BUEGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-cv-1097-TMP |
| | ) | |
| ANDREW SAUL, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER AFFIRMING THE COMMISSIONER'S DECISION

Before the court is plaintiff William Buege's appeal from a final decision denying his application for supplemental security income under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-34, filed on April 30, 2020. (ECF No. 1.) The parties have consented to the jurisdiction of the United States magistrate judge under 28 U.S.C. § 636(c). (ECF No. 17.) For the reasons below, the Commissioner's decision is AFFIRMED.

## I.    FINDINGS OF FACT

Plaintiff William Buege filed the instant application for disability insurance benefits on June 13, 2017. (R. at 304.) His application alleges that he has been disabled since March 15, 2013, and that he suffers from post-traumatic stress disorder ("PTSD"), a "left wing scapula injury with bursitis," "diabetes II with neuropathy," a "lower back injury," "small airway disease/asthma,"

a "transient ischemic attack with memory loss issues," "unspecified sleep apnea," and "hearing loss/tinnitus." (R. at 304, 319.) After his claim was denied initially and on reconsideration, Buege requested a hearing before an administrative law judge ("ALJ"). (R. at 250.) Accordingly, a hearing was held on December 4, 2018. (R. at 191.) During the hearing, Buege testified about his work history and the nature and extent of his PTSD, asthma, diabetes, and back, neck, and shoulder injuries. (R. at 194-206.) He also testified about how these alleged impairments affect his daily life, stating, for example, that he becomes tired after performing "any kind of exertion like walking," that he can lift only five to eight pounds repetitively but that he becomes sore the more he lifts, that he cannot be around large crowds, that he has not been able to go on a date with his wife in five years because of his PTSD, and that he cannot focus because his "mind[] [is] always racing with something else and [he] can't control it." (R. at 200, 201, 202, 204.) Buege also testified that he helps his wife with yardwork (but needs frequent breaks) and that he enjoys reloading ammunition, though the numbness in his hands has recently made it difficult for him to pour the powder. (R. at 202.) While Buege's prescription for pain medication requires that he take two doses a day, he testified that he only takes his medications when he feels like he "can't go

any further without taking it," which is about once a day.[1] (R. at 203.)

On February 20, 2019, the ALJ issued a decision finding that Buege was not disabled at any time between his alleged onset date and the date that he was last eligible for insurance. (R. at 28.) The ALJ reached this decision by following the Five Step Process for evaluating disability benefits claims. (R. at 12.) At the outset of his opinion, the ALJ found that Buege "last met the insured status requirements of the Social Security Act on June 30, 2017," thereby making the relevant period of disability between March 15, 2013, and June 30, 2017. (R. at 13.) The ALJ then found that Buege had not engaged in any substantial gainful activity during the relevant period of disability. (R. at 13.) At the second step, the ALJ found that Buege suffered from several severe impairments, including diabetes, degenerative joint disease of the left shoulder, degenerative disc disease ("DDD"), and PTSD. (R. at 13.) In reaching this conclusion, the ALJ considered that Buege also was obese, but that his obesity did not significantly limit his physical or mental ability to do basic work activities. (R. at 13.) The ALJ also found that Buege suffered from several other impairments but that they were not severe because they caused only

---

[1] A vocational expert also testified at the hearing regarding what work existed in significant numbers in the national economy for hypothetical individuals with varying residual functional capacities ("RFC") and work-related limitations. (R. at 206-10.)

intermittent symptoms and did not significantly limit his ability to perform basic work activities, including obstructive sleep apnea, asthma, tinnitus, wrist strain, hypertension, headaches, diabetic retinopathy, and gastroesophageal reflux disease. (R. at 14-15.)

At the third step, the ALJ found that Buege did not have an impairment, or any combination of impairments, that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ then proceeded to determine Buege's RFC. The ALJ opined that, during the relevant period of disability, Buege had the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c). However, the ALJ also opined that Buege

> can only frequently reach with the left upper extremity and can perform no overhead work with the left upper extremity. [He] can frequently climb, balance, stoop, kneel, crouch, and crawl. [He] should avoid work hazards. [He] can perform simple, routine tasks but is limited to only occasional[] contact with coworkers, supervisors, and the public. [He] can tolerate only occasional changes in work environment.

(R. at 16.)

In crafting Buege's RFC, the ALJ began by summarizing his medical history during the relevant period of disability. The ALJ first noted that Buege was diagnosed with diabetes but that "records indicate relatively good control of the condition, with some note of noncompliance." (R. at 16.) The ALJ observed that, as

of August 2013, Buege was being treated with glipizide and metformin. (R. at 17.) However, follow up appointments in February 2014, May 2014, July 2014, October 2014, November 2014, April 2015, December 2015, and March 2016 showed several incidents of noncompliance with his prescribed diet and of incidents where he engaged in activities that were inconsistent with a finding of disability, such as going on a vacation in early 2014 that involved "a lot of walking," hunting, walking his dogs, and welding. (R. at 17-18.) Although the ALJ acknowledged that "[l]ater records show better compliance, with improvement in control," incidents of noncompliance continued into the final year before his insurance eligibility expired, such as riding a bike three miles a day as recently as June 2017. (R. at 17-18; 135.) The ALJ also pointed out several incidents where Buege's medical providers observed that he was not taking his medication as prescribed and was instead self-adjusting his medication depending on his blood sugar level. (R. at 17-18.)

The ALJ also observed that Buege was diagnosed with degenerative joint disease of the left shoulder and DDD of the lumbar spine. (R. at 18.) However, the ALJ noted that these conditions were diagnosed well before Buege's alleged disability onset date and that he was able to engage in substantial gainful activity for several years following these diagnoses. (R. at 18.) In particular, the ALJ reasoned that Buege's medical records trace

his shoulder injury to 1995 and that, before he stopped working, he "was noted to have weakened movement, with pain on movement and deformity, in the left shoulder" but that an X-ray was normal. (R. at 18.) However, the ALJ found that, "[d]espite the remote injury, records show little, if any, consistent treatment or complaints regarding the shoulder for several years after the alleged onset date." (R. at 18.) The ALJ also acknowledged that Buege was injured in a three-wheeler accident in November of 2014. (R. at 19.) The ALJ observed that, following treatment for the accident, Buege's reported shoulder pain only reached a level of three out of ten when he would perform strenuous activities such as lifting fifty-pound bags of dog food and that, otherwise, it was a zero out of ten. (R. at 19.) Additionally, a magnetic resonance imaging ("MRI") scan the following September "did not fully support a finding of disability" because there was no spinal stenosis, disc herniation, or nerve root impingement noted in the scan. (R. at 19.) Similarly, an MRI in October of 2015 showed no obvious tear, and, based on his self-reported pain, he was prescribed "pain medications, physical therapy, and conservative care." (R. at 19-20.) The ALJ observed that, in September 2016, Buege reported to his primary care doctor that he was feeling well and that he refused a referral for further imaging. (R. at 20.) Buege's conservative treatment continued through the date he was last insured and, according to the ALJ, there is little evidence suggesting that Buege has

returned to physical therapy since the date he was last insured beyond an appointment with his primary care doctor in May of 2017 where he reported "back pain at a level of 5 on an increasing scale of 10, but little note was made of specific treatment for [his] back." (R. at 20.)

Next, the ALJ considered Buege's treatment history for PTSD. The ALJ observed that doctors began increasing his medication in February 2014 and that, "[a]fter adjustment, the record shows improvement and some medication efficacy, with further medication adjustments for greater efficacy." (R. at 21.) Throughout his treatment, the ALJ noted that Buege reported he engaged in activities that were not consistent with disabling PTSD, such as hunting and fishing, shopping in stores (albeit only when not crowded), gunsmithing, working on cars and all-terrain-vehicles ("ATV"), going to movies, going to church, and welding. (R. at 20-22.) Although he reported nightmares, anxiety, and insomnia to his psychiatrist in May 2015, the ALJ noted that he still had "the ability to function well on a day to day basis" and that there was "no evidence of major mood, thought, or psychotic disorder." (R. at 22.) Buege reported that, by January 2017, "his mood was better and he had some alleviation of his reported pain and headaches." (R. at 23.)

The ALJ then turned to the medical source opinions in the record, including an opinion from examining physician Dr. John

Woods, M.D. (R. at 1942.) Dr. Woods examined Buege on November 27, 2018. (R. at 1942.) Following his examination of Buege's lungs, Dr. Woods observed that a "[p]ulmonary exam was completely unremarkable. Normal inspiratory and expiratory phases were noted. There was no wheezing. There were no rales. He did not appear to get out of breath with conversation or examination maneuvers. He was not tachypneic." (R. at 2943.) Regarding Buege's musculoskeletal system, Dr. Woods observed that his

> [g]ait was normal. Claimant got onto and off of the exam table without difficulty. Lumbar flexion was mildly diminished. External rotation and forward elevation was mildly decreased in both shoulders and claimant clearly experienced pain in raising his arms above his head, though he could accomplish this maneuver. Mild swelling noted in the PIP and MCP joints of both hands. Straight leg raise testing was negative bilaterally. He had full range of motion in his hips. Bilateral pes planus was noted. I noted no muscle atrophy. Motor strength was 5/5 symmetrically in the upper and lower extremities. Remainder of musculoskeletal exam was unremarkable.

(R. at 2943.) Overall, Dr. Woods's examination resulted in the following impressions:

> chronic low back pain secondary to lumbar degenerative disc disease with consistent lumbar MRI findings from August 2016[;] bilateral shoulder pain in the setting of a history of cervical degenerative disc disease and left shoulder tendinitis with consistent MRI findings[;] type 2 diabetes mellitus with reported history peripheral sensory neuropathy, but grossly normal sensory exam today[;] history of asthma on prescribed inhalers with normal pulmonary exam today[;] bilateral pes planus[;] obstructive sleep apnea on CPAP[;] history of depressive disorder[; and] history of PTSD[.]

(R. at 2944.) Dr. Woods also provided Buege with a Medical Assessment to Do Work-Related Activities Form. In his assessment, Dr. Woods opined that Buege could occasionally lift and/or carry a maximum of twenty pounds, that he could frequently lift and/or carry a maximum of ten pounds, that he could sit for up to two hours at a time without interruption, that he could stand/walk for up to thirty minutes without interruption, and that he could sit for a total of eight hours in a work day and stand/walk for a total of three hours in a work day. (R. at 2945-46.) Dr. Woods noted that he based this opinion on Buege's

> symptoms of chronic low back pain, [bilateral] shoulder
> pain, occasional dyspnea, medical record documentation
> of lumbar [and] cervical DDD [and] [left] shoulder
> tendinitis, including imaging studies, along with asthma
> on prescribed inhaler [and] obstructive sleep apnea on
> CPAP, as well as PTSD [and] peripheral sensory
> neuropathy[,] exam findings today as described in record
> of examination including [decreased range of motion]
> lumbar spine [and] [bilateral] shoulders.

(R. at 2945.) Additionally, Dr. Woods opined that Buege could use both upper extremities to occasionally reach in all directions, to frequently handle and finger, to continuously feel, and to less than occasionally push and pull. (R. at 2947.) This opinion was based on Buege's "[bilateral] shoulder pain with medical record documentation (including imaging) of cervical DDD [and] [left] shoulder tendinitis with decreased [range of motion] [bilateral] shoulders." (R. at 2947.) As for Buege's feet, Dr. Woods opined that he could operate feet controls less than occasionally because

of his "symptoms of low back pain [and] medical record documentation of lumbar DDD, [and] exam findings today of [decreased] lumbar flexion [and] [bilateral] pes planus." (R. at 2948.) Regarding postural activities, Dr. Woods opined that Buege could occasionally climb stairs or ramps, never climb ladders or scaffolds, occasionally balance, never stoop, never kneel, and never crawl. (R. at 2948.) Next, Dr. Woods considered Buege's environmental limitations, opining that he could continuously be exposed to unprotected heights, moving mechanical parts, as well as humidity and wetness, that he could less than occasionally operate a motor vehicle because of his musculoskeletal symptoms, and that he could never be exposed to dust/odors/fumes/pulmonary irritants, extreme temperatures, or vibrations because of his asthma and musculoskeletal symptoms. (R. at 2950.) Lastly, Dr. Woods opined that Buege could be exposed to an environment with at most a moderate noise level, such as an office, because of his PTSD. (R. at 2950.)

The ALJ found that Dr. Woods's opinion was unpersuasive for several reasons. (R. at 24.) For instance, the ALJ observed that Dr. Woods examined Buege nearly eighteen months after the relevant period of disability had ended. (R. at 24.) The ALJ also reasoned that Dr. Woods's opinion was "not well supported or explained and [was] not consistent with his own observations of the claimant's reports." (R. at 24.) Specifically, the ALJ observed that Dr. Woods

imposed significant restrictions based on Buege's asthma but that his own examination findings "showed little in the way of respiratory abnormalities" and that Buege reported a "fairly active" lifestyle. (R. at 24.) Additionally, the ALJ found that Dr. Woods proposed significant exertional, postural, and manipulative limitations while observing only mild abnormalities in his own examination and that his physical examination "provide[d] little support for the opined limitations due to PTSD." (R. at 24.)

The ALJ then turned to the other medical sources in the record. The ALJ found that state medical consultant James Gregory, M.D., was partially persuasive because his report was supported and explained by references to the record, but was internally inconsistent. (R. at 24-25.) Similarly, the ALJ found that state medical consultant Celia Gulbenk, M.D., was partially persuasive because, although it was well supported, her report did not fully consider Buege's limitations from his left shoulder disorder. (R. at 25.) As for state psychological consultants George Davis, Ph.D., and Fawz Schoup, Ph.D., the ALJ found they were partially persuasive because their opinions were well supported by the record but were overly optimistic. (R. at 25-26.)

Relying on the above RFC determination, the ALJ found that, through the date that Buege was last insured, Buege had been unable to perform any of his past relevant work. (R. at 26.) Before

turning to whether other jobs exist in the national economy that Buege could perform, the ALJ observed that Buege was forty-three years old on the date that he was last eligible for insurance and that he had at least a high school education. (R. at 26.) The ALJ then found that, at least as of the date he was last insured, Buege had the RFC, age, education, and work experience to enter the workforce in at least one of several jobs that exist in significant numbers in the national economy. (R. at 27.) Specifically, the ALJ observed that Buege would have been able to work as an auto dealer, a laundry worker, and a machine feeder on the date he was last eligible for insurance. (R. at 27.)

Because Buege could have made a successful adjustment to other work that existed in significant numbers in the national economy, the ALJ ruled that a finding of "not disabled" was appropriate. Buege filed a request for review with the Appeals Counsel on March 22, 2019. (R. at 302.) The Appeals Counsel denied Buege's request on March 3, 2020. (R. at 1.) Buege filed the instant lawsuit on April 30, 2020. (ECF No. 1.) Buege's only argument on appeal is that the ALJ erred in how he considered and assigned weight to Dr. Woods's opinion.

## II.  CONCLUSIONS OF LAW

### A.  Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a

hearing to which he or she was a party. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision and whether the Commissioner used the proper legal criteria in making the decision. Id.; Cardew v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is more than a scintilla of evidence but less than a preponderance, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record as a whole and "must 'take into account whatever in the record fairly detracts from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support

a decision the other way." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (quoting Smith v. Sec'y of Health & Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Rather, the Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the testimony. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir. 1990).

## B. The Five-Step Analysis

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). Additionally, section 423(d)(2) of the Act states that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any

individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Under the Act, the claimant bears the ultimate burden of establishing an entitlement to benefits. Oliver v. Comm'r of Soc. Sec., 415 F. App'x 681, 682 (6th Cir. 2011). The initial burden is on the claimant to prove she has a disability as defined by the Act. Siebert v. Comm'r of Soc. Sec., 105 F. App'x 744, 746 (6th Cir. 2004) (citing Walters, 127 F.3d at 529); see also Born v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir. 1990). If the claimant is able to do so, the burden then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. Born, 923 F.2d at 1173; see also Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 559 (6th Cir. 2014).

Entitlement to Social Security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. See 20 C.F.R. §§ 404.1520 & 416.920. First, the claimant must not be engaged in substantial gainful activity. See 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, a finding must be made that the claimant suffers from a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(5)(ii). In the third step, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. See 20 C.F.R. §§ 404.1520(d),

404.1525, 404.1526. If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled. On the other hand, if the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the RFC to return to any past relevant work. See 20 C.F.R. §§ 404.1520(a)(4)(iv) & 404.1520(e). If the ALJ determines that the claimant can return to past relevant work, then a finding of not disabled must be entered. Id. But if the ALJ finds the claimant unable to perform past relevant work, then at the fifth step the ALJ must determine whether the claimant can perform other work existing in significant numbers in the national economy. See 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g)(1), 416.960(c)(1)-(2). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. 20 C.F.R. § 404.1520(a)(4).

## C.  Medical Opinion Evidence

Buege's only argument on appeal is that the ALJ "failed to give articulated reasons for his rejection of the opinion of examining doctor, Dr. John Woods." (ECF No. 26 at 19.) Buege contends that, because the ALJ allegedly erred in weighing Dr. Woods's opinion, the ALJ's RFC determination – and likewise his subsequent decision on disability generally – is not supported by substantial evidence. As a threshold matter, because Buege filed

his application for disability insurance benefits after March 27, 2017, the ALJ was required to adhere to 20 C.F.R. § 404.1520c in how he considered medical opinions and prior administrative medical findings in the record. See Jones v. Berryhill, 392 F. Supp. 3d 831, 839 (E.D. Tenn. 2019). Additionally, because Buege's disability insurance status expired on June 30, 2017, Buege "must therefore prove that he became disabled prior to [that date], in order to qualify for disability benefits." Moon v. Sullivan, 923 F.3d 1175, 1182 (6th Cir. 1990).

Under 20 C.F.R. § 404.1520c(a), an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." Instead, ALJs are directed to analyze the persuasiveness of medical opinions and prior administrative medical findings by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(c)(1) to (5). The regulations provide that the supportability and consistency factors are the most important factors for an ALJ to consider. 20 C.F.R. § 404.1520c(a). In articulating the persuasiveness of each medical source opinion, an ALJ must explain how he or she considered these two factors. 20 C.F.R. §

404.1520c(b)(2). As for the other listed factors, the regulations state that an ALJ may, but is not required to, articulate how he or she considered them in evaluating a medical source opinion. 20 C.F.R. § 404.1520c(b)(2). In practice, "the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion." Lester v. Saul, No. 5:20CV1364, 2020 WL 8093313, at *10 (N.D. Ohio, Dec. 11, 2020), report and recommendation adopted by, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021) (quoting Ryan L.F. v. Comm'r of Soc. Sec., No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019)); see also Jones, 392 F. Supp. 3d at 839 (holding that claims filed after March 27, 2017, are not subject to the treating physician rule or other requirements based on superseded regulations) (citing Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 406 (6th Cir. 2009)). Regardless, "the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" Lester, 2020 WL 8093313, at *10 (quoting Ryan L.F., 2019 WL 119287, at *4). As such, despite the new standards being more relaxed than their predecessors, an ALJ must still "provide a coherent explanation of his [or her] reasoning" in analyzing each medical opinion. Id. at *14.

Buege contends that the ALJ erred in considering Dr. Woods's opinion by relying on "boilerplate language for articulated reasons" and by "fail[ing] to specifically point out any conflicts

or inconsistencies between Dr. Woods's opinions and examination findings." (ECF No. 26 at 19-20.) The court finds that these contentions ask more of the ALJ than the revised regulations require. In his decision, the ALJ expressly found that Dr. Woods's opinion was not supported by the results of his own examination and that the opinion was "overly pessimistic when viewed in light of the record as a whole." (R. at 24.); see Lafevers v. Comm'r of Soc. Sec., No. 6:20-cv-06064, 2021 WL 2459802, at *3-4 (W.D. Ark. June 16, 2021) (finding that an ALJ complied with 20 C.F.R. § 404.1520c where he "explicitly found 'Dr. English's opinion . . . is also overstated and *not consistent*' and specifically referenced the supportability of his findings" (alteration and emphasis in original)). The ALJ observed that the "significant . . . limitations" contained in Dr. Woods's opinion were contradicted by Buege's "fairly active reported lifestyle," that Dr. Woods's physical examination showed "only mild abnormalities," and that "the doctor . . . observed little in the way of respiratory abnormalities in his own examination." (R. at 24.) The ALJ's conclusions about Dr. Woods's examination are not misplaced, as Dr. Woods noted in his report that a "[p]ulmonary exam was completely unremarkable" and that, accounting for a few mild limitations, the "musculoskeletal exam was unremarkable." (R. at 2943.) That the ALJ did not cite to the specific portions of Dr. Woods's report in this section (beyond citing generally to Dr.

Woods's examination impressions and opinion) is not reversible error because, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." Simons v. Barnhart, 114 F. App'x 727, 733 (6th Cir. 2004).

In any event, although the ALJ provided broad citations to the record and described his concerns with Dr. Woods's examination in general terms, the ALJ elaborated on several aspects of the record that illustrate his concerns with Dr. Woods's opinion in earlier sections of his decision. For instance, the ALJ recounted Buege's extensive medical history from 2013 onward when discussing how he crafted Buege's RFC – breaking down his records regarding his treatment and symptoms for diabetes, DDD, and PTSD — and expressly identified several occasions where the ALJ believed Buege's medical record was not fully consistent with a finding of disability. (R. at 16-23.); see Rice v. Saul, No. 20-10500, 2021 WL 1822309, at *7 (E. D. Mich. Feb. 23, 2021) (finding that "[t]he ALJ provided a sufficient analysis" where the ALJ's discussion was "prefaced by a thorough discussion of the treating, consulting, and non-examining records"). Similarly, throughout his opinion, the ALJ highlighted instances in the record where Buege's self-reported activities (as recently as June 2017) contradicted a finding of disability, such as reports of riding a bike, going on

a vacation involving "a lot of walking," gunsmithing, working on cars, welding, caring for his three large dogs (which involves walking and picking up fifty-pound bags of food), working on his deer camp, hunting, fishing, shooting, and tinkering with a vintage ATV. (R. at 14, 17, 21.) The ALJ even noted that, after Buege was injured in a three-wheeler accident in May 2015, he was able to lift a fifty-pound bag of dog food without being in significant pain. (R. at 19.) As the ALJ opined, these activities are all inconsistent with Dr. Woods's opined limitations. (R. at 14.); see Rottmann v. Comm'r of Soc. Sec., 817 F. App'x 192, 196 (6th Cir. 2020) ("We therefore agree with the district court that the inconsistencies between Rottmann's self-reported activities and the treating physicians' medical reports provide substantial evidence to support the ALJ's findings."); Neumann v. Comm'r of Soc. Sec., No. 1:19-cv-816, 2020 WL 7350587, at *7 (W.D. Mich. Dec. 15, 2020) ("The ALJ properly weighed Dr. LeMieux's opinions and expressed that he was assigning them little weight as they were inconsistent not only with the medical record as a whole, but also with Plaintiff's self-reported activities."). Further, the ALJ pointed out at least two instances where Buege declined treatment, noting that in October 2015 Buege put off therapy for his PTSD until after hunting season and that in September 2016 Buege refused a referral for imaging on his back and shoulder because he reported "feeling well." (R. at 20, 22.) Because these

observations were already in the opinion, the ALJ did not err by not repeating them when discussing how he considered Dr. Woods's examination. See Crum v. Comm'r of Soc. Sec., 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing Forrest v. Comm'r of Soc. Sec., 591 F. App'x 359, 366 (6th Cir. 2014)).

With this in mind, the court thus finds that the ALJ sufficiently addressed both the supportability and consistency factors – i.e. "the most important factors" — in considering Dr. Woods's opinion. 20 C.F.R. § 404.1520c(a). This is all that the revised regulations require. See Smith v. Comm'r of Soc. Sec., No. 2:20-cv-2886, 2021 WL 1996562, at *6 (S.D. Ohio May 19, 2021) ("[T]he ALJ explained how the supportability and consistency factors were considered. That is all the regulations require."); Bovenzi v. Saul, NO. 1:20CV0185, 2021 WL 1206466, at *3 (N.D. Ohio Mar. 31, 2021) (reasoning that, under the new regulations, an ALJ need only "articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions'") (quoting Lester, 2020 WL 8093313, at *10). That the ALJ also considered the fact that Dr. Woods examined Buege nearly a year and a half after the date he was last eligible for disability

insurance benefits further supports the conclusion that his decision is supported by substantial evidence. See 20 C.F.R. § 404.1520c(c)(5) (authorizing ALJs to consider any "other factors that tend to support or contradict a medical opinion or prior administrative medical finding"); Grisier v. Comm'r of Soc. Sec., 721 F. App'x 473, 477 (6th Cir. 2018) ("[P]ost-date-last-insured medical evidence generally has little probative value unless it illuminates the claimant's health before the insurance cutoff date."); Emard v. Comm'r of Soc. Sec., 953 F.3d 844, 849-50 (6th Cir. 2016) ("[E]vidence of a claimant's medical condition after the last insured date is only considered to the extent it illuminates that condition before the expiration of the claimant's insured status.'") (quoting McAfee v. Comm'r of Soc. Sec., No. 1:16-CV-1417, 2018 WL 1516846, at *4 (W.D. Mich. Mar. 28, 2018)). Because nearly a year and a half elapsed between when Buege was last eligible for disability insurance benefits and the examination, it was not unreasonable for the ALJ to be concerned that Dr. Woods's findings regarding Buege's present condition "likely described a deterioration in [Buege]'s condition, rather than [Buege]'s condition during the time period in question." Johnson v. Comm'r of Soc. Sec., 535 F. App'x 498, 506 (6th Cir. 2013). This was a valid reason for the ALJ to discount the persuasiveness of Dr. Woods's opinion. See id.; Emard, 953 F.3d at 849-50. The court therefore finds that the ALJ's conclusion that

Dr. Woods's opinion was unpersuasive is supported by substantial evidence. <u>See</u> <u>Moss v. Comm'r of Soc. Sec.</u>, No. 1:20-cv-243, 2021 WL 2282694, at *6 (W.D. Mich. June 4, 2021) ("[A]n ALJ's decision is not subject to reversal, even though there may be substantial evidence in the record that would have supported the opposite conclusion, if substantial evidence also supports the conclusion that was reached by the ALJ.") (citing <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).

### III. CONCLUSION

For the reasons above, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

/s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

July 7, 2021
Date